UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| UNITED STATE OF AMERICA,<br><br>　　Plaintiff,<br><br>v.<br><br>SCOTT JONES,<br><br>　　Defendant. | 2:09-cr-00288-KJD-RJJ<br><br>**REPORT & RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE**<br><br>Defendant's Motion to Suppress (#24) |

This matter came before the Court for a hearing on Defendant's Motion to Suppress (#24). The Court also considered the Government's Response (#28), Defendant's Supplemental Memorandum (#45), the Government's Response (#46), and evidence and testimony presented at the hearing.

## BACKGROUND

Defendant, Jones, was indicted on two counts – receipt and possession of child pornography in violation of 18 U.S.C. §§ 2252A(a)(2) and 2252A(a)(5)(B), respectively.

Sometime near the end of December 2004, Jones' daughter, "JT"[1], ran away from her father's home in Las Vegas. JT was taken into custody by Child Protective Services (CPS) after notifying her mother, who was living in another state, that she had found child pornography on her father's computer.

The Las Vegas Metropolitan Police Department (LVMPD) interviewed JT on January 3, 2005. She told them that while searching her father's computer for music files, she had

---

[1] Abbreviation used to protect the identity of Jones' daughter, a teenage minor at the time of the events described.

1  discovered a folder containing a picture of her naked torso. JT searched the computer further and
2  found pictures of what she believed to be child pornography. She printed out the pictures and
3  advised LVMPD that she had left the pictures with a friend for safekeeping. Upon
4  accompanying JT to her friends' home, JT recovered a folder containing the pictures she had
5  printed out from her father's computer and turned them over to the police. With this
6  information, LVMPD obtained a warrant for the search and seizure of any items in Jones' home
7  related to child pornography, including two computers.

8       On that same day, Jones contacted both LVMPD and CPS in search of his daughter.
9  LVMPD first told Jones to wait for a Detective to contact him. He then called CPS. Because of
10 the information garnered from JT, LVMPD advised CPS not to reveal her location, release her to
11 Jones or let Jones have any contact with her. CPS advised Jones to wait for LVMPD to contact
12 him with information regarding his daughter. After Jones contacted LVMPD once more, he was
13 asked to come in and speak with police.

14      On January 4, 2005, Jones drove to the police department and was interviewed by police.
15 Jones was advised that he was free to leave at any time. The first part of the interview focused
16 on his daughter, JT, and the second focused on the photos and information JT had provided them.
17 Near the conclusion of the 45 minute interview, LVMPD informed Jones that they had a warrant
18 to search his home and seize his computer equipment, and any other items that could be related
19 to child pornography. Jones never admitted to downloading any pornography, adult or child.
20 Jones was not arrested at that time, but chose to accompany police to his home where they
21 executed the search warrant. Among other things, two computers and a collection of compact
22 discs seized. One of the computers that LVMPD searched contained thousands of images
23 depicting child pornography

24      In February 2007, LVMPD visited Jones at his home and asked him to come in again for
25 an additional interview. Jones agreed to come to the police station the next day, around 5 pm,
26 after he finished work.

27      The next day, February 28, 2007, Jones arrived at the police station early and was
28 accompanied by his brother. Jones was escorted to an interview room. The door to the interview

1  room did not have a lock or locking mechanism.  Once in the room, Jones was told that he was
2  not under arrest and that he was not being forced or compelled to come in and talk with police.
3  Towards the end of the 2 ½ hour long interview, Jones made incriminating statements to police.
4  After the interview, he was escorted out of the police station, which had closed to the public, and
5  went home.  He was not arrested at that time.  Jones was indicted two years later.

6  **DISCUSSION**

7  **I. The Warrant**

8      Jones asks the Court to suppress the evidence found as a result of the 2005 search
9  warrant.  Jones asserts that the if the warrant had included facts that were deliberately or
10 recklessly omitted, it would have lacked probable cause.  He also asserts that the warrant was too
11 broad.

12     A.  Probable Cause

13     "A search warrant, to be valid, must be supported by an affidavit establishing probable
14 cause." *United States v. Jawara*, 474 F.3d 565, 582 (9th Cir. 2007) (*quoting United States v.*
15 *Stanert*, 762 F.2d 775, 778 (9th Cir.1985)).  Probable cause exists when, given the totality of the
16 circumstances set forth in the affidavit, there is a fair probability that contraband or evidence of a
17 crime will be found in a particular place.  *Crowe v. County of San Diego*, 608 F.3d 406, 434
18 (9th Cir. 2010).  A defendant can challenge a facially valid affidavit by making a substantial
19 preliminary showing that (1) the affidavit contains intentionally or recklessly false statements,
20 and (2) the affidavit purged of its falsities would not be sufficient to support a finding of
21 probable cause.  *United States v. Stanert*, 762 F.2d 775, 780 (9th Cir. 1986).  Such a challenge
22 must be accompanied by a detailed offer of proof.  *United States v. Craighead*, 539 F.3d 1073,
23 1080 (9th Cir. 2008).  A warrant may also be challenged if omissions, deliberately or recklessly
24 made, tend to mislead the magistrate judge.  *United States v. Craighead*, 539 F.3d 1073, 1081
25 (9th Cir. 2008).  The omission rule does not require an affiant to provide general information
26 about every possible theory that would controvert the affiant's good-faith belief that probable
27 cause existed for the search.  *Id*.
28     Here, probable cause exists to validate the warrant.  Jones asserts that if the affidavit

1   submitted in support of the warrant had included facts regarding JT's history, her inconsistent
2   statements, and that she had been diagnosed with Oppositional Defiance Disorder (ODD), that
3   there would have been no probable cause to issue the warrant.  Jones' argument fails to meet the
4   requirements to challenge the affidavit.
5        Jones has not shown that the warrant contained any false statements, reckless or
6   intentional.  Neither can he show that officers intentionally or recklessly omitted information.
7   Jones has failed to make a substantial showing supported by detailed proof that information was
8   recklessly or intentionally omitted.
9        Looking at the totality of the circumstances, nothing that Jones claims the officers
10  omitted would have changed the outcome, even if it had been included.  JT was able to produce
11  seven pictures that depicted lewd or sex acts involving children.  Warrant Affidavit at p. 6 ¶ 9,
12  Attached to Defendant's Motion to Suppress (#24).  She also produced printed out internet
13  "chats" she stated were between her father and an unknown girl which contained evidence that
14  pictures had been received and saved to a folder in the path
15  C:\documents and Settings\Scott\Desktop\New Folder.  *Id* at p. 6 ¶ 10.  She left these items with
16  a friend after running away, and then later showed them to officers.  JT's accusations were
17  supported by physical evidence that corroborated her story.  *See United States v. Rowland*, 464
18  F.3d 899, 907-908 (9th Cir. 2006) (explaining that a tip is more reliable if the informant reveals
19  the basis of her knowledge).  These facts alone demonstrate that there was a fair probability that
20  contraband and evidence of a crime would be found on Jones' computer.  There is no deficiency
21  of probable cause.
22       B.  Breadth of the Warrant
23       "While a search warrant must describe items to be seized with particularity sufficient to
24  prevent a general, exploratory rummaging in a person's belongings,  it need only be reasonably
25  specific, rather than elaborately detailed, and the specificity required varies depending on the
26  circumstances of the case and the type of items involved." *United States v. Rude*, 88
27  F.3d 1538, 1551 (9th Cir. 1996) (citations and quotation marks omitted).  Warrants subjecting
28  computer equipment to blanket seizure and describing it in generic terms are acceptable when a

more precise description is not possible. *United States v. Lacy*, 119 F.3d 742, 746 (9th Cir. 1997).

Here, a more precise description of the items to be searched was not possible. JT found the pictures she printed out during a wide search of her father's computer, and could not recall exactly which files and folders she searched. The officers knew that JT had printed out the pictures and chat from someone's computer, but they were not sure as to which specific computer, media device, drive, or disc the chats and images, or others like it, were being stored. Given what the officers knew, the breadth of the warrant was reasonably specific and did not amount to an exploratory rummaging. *See Lacy*, 119 F.3d at 746-747 (holding that a warrant seizing all computer and computer related equipment was not overbroad where the government knew that child pornography had been downloaded but did not know where it was being stored or what hardware and software was being used to access it).

Furthermore, the nature of digital information is different from other searchable items. The warrant affidavit explains:

> As is the case with most digital technology, communications by way of computer can be saved or stored on the computer used for these purposes. Storing this information can be intentional, i.e., by saving an email as a file on the computer or saving the location of ones' favorite website(s) in, for example, "bookmarks" files. Digital information can also be retained unintentionally, e.g., traces of the path on an electronic communication may be automatically stored in many places.
>
> Computer hard drives and other removable storage media ... are convenient items in which digital information can be stored for later retrieval.

Affidavit to Warrant at 7 ¶¶ 4, 5, Attached as Exhibit A to Defendant's Motion (#24). In this context, the warrant was as precise as it could be in relation to searching for evidence of child pornography and child pornography related chats.

**II. The January 2005 Statement**

Jones alleges that his statement given to the police in January 2005 should be stricken because it was involuntarily given. He argues that he was coerced into talking to the police in order to get information about his daughter, who was missing, and that he was not given the warnings as required by *Miranda* and the Fifth Amendment. *Miranda v. Arizona*, 384 U.S. 436,

458 (1966).

### A. Whether Jones was in Custody

*Miranda* warnings are only required if a person is in custody. *United States v. Kim*, 292 F.3d 969, 973 (9th Cir. 2002). To determine whether an individual was in custody, a court must examine the totality of the circumstances surrounding the interrogation, and decide whether there was a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest. *United States v. Bassignani*, 575 F.3d 879, 883 (9th Cir. 2009). If a "reasonable innocent person in such circumstances would conclude that after brief questioning he or she would not be free to leave," then that person is in custody. *Bassignani*, 575 F.3d at 883 (*quoting United States v. Booth*, 669 F.2d 1231, 1235 (9th Cir. 1981). The determination is objective, not based on the subjective views of the officers or the person being questioned. *Bassignani*, 575 F.3d at 883.

There are five, nonexclusive and noncomprehensive factors relevant to the custody determination: 1) the language used to summon the individual; (2) the extent to which the defendant is confronted with evidence of guilt; (3) the physical surroundings of the interrogation; (4) the duration of the detention; and (5) the degree of pressure applied to detain the individual. *Bassignani*, 575 F.3d at 883 (quotation marks and citations omitted). The ultimate determination is whether a reasonable person would have believed he could freely walk away from the interrogators. *Bassignani*, 575 F.3d at 884.

Here, none of the factors support Jones' assertion that he was in custody when he gave his 2005 statement. The only factor that might be relevant is the first factor: the language used to summon the individual. Jones was told by CPS that he would need to speak with police in order to obtain information about his runaway daughter. CPS did this as requested by LVMPD in order to protect JT because it was not clear at the time whether Jones posed a threat to his daughter. CPS Report at p. 22, Attached as Exhibit A to Hearing. Furthermore, after talking with police about his daughter, Jones was told "you're not compelled to talk to us today and anytime you wanna leave, you're free to leave. We're not–you're not under arrest or anything like that, so if we get to stuff you do feel is not appropriate or you don't wanna talk about it, just tell us you don't want to, we're not gonna make you." Jones 2005 Statement at p. 17,

Government Exhibit 2 to Hearing. It was only then that Jones was told about the child pornography and that officers had obtained a warrant to search his home.

The second factor is the extent to which Jones was confronted with evidence of guilt. Here, he was not confronted with any evidence of guilt. In fact, when explaining to Jones why they got the warrant the police stated, "doesn't mean you downloaded it but it means [JT] got it from somewhere and somebody committed a crime somewhere." Jones 2005 Statement at 30, Exhibit 2 to Hearing.

The third, fourth, and fifth factors do not support Jones' argument. He was interviewed in a standard interview room for 45 minutes, and there was no pressure applied to detain him at all. He accompanied the officers to his home where they executed the warrant. He was not detained or arrested. Given the above facts, a reasonable innocent person would believe that they were free to leave. *Bassignani*, 575 F.3d at 883. He was not in custody during his 2005 statement and therefore, no *Miranda* warning was required.

B.  Whether Jones' 2005 Statement Was Voluntary

To determine whether a statement was voluntarily, the court considers whether the totality of the circumstances surrounding the interrogation was such that the defendant's will was overborne. *United States v. Wright*, 625 F.3d 583, 603 (9th Cir. 2010). Circumstances to evaluate include the length of the interrogation, the location, its continuity, and whether any techniques or methods offensive to due process were used. *Clark v. Murphy*, 331 F.3d 1062, 1072 (9th Cir. 2003).

Here, there is nothing to indicate the Jones' 2005 statement was given involuntarily or that he was coerced. He was told that he was not under arrest, that he would not be compelled to speak, and the discussion only lasted 45 minutes. He was questioned in a standard-sized police interview room and was not physically or psychologically threatened. He was not in custody. When advised about the warrant, he was told "if you don't wanna come with us, you don't have to. We're not going to compel you to. Ah, obviously if you wanna come with us, then, then leave, you can do that as well." Jones 2005 Statement at p. 30, Government Exhibit 2 to Hearing. After the interview, he accompanied police to his house where they executed the search

1  warrant.  He was free to leave at any time and was not compelled to speak to police.

2  That he went to the police station in order to obtain information about his runaway
3  daughter does not indicate that his will was overborne during the interview.  Furthermore, Jones
4  made no admissions at the 2005 interview.  Given the totality of the circumstances, Jones will
5  was not overborne, and his statement was voluntary.

6  **III.  The February 2007 Statement**

7  A.  Whether Jones was in Custody

8  Here, the totality of the circumstances support Jones' claim that he was in custody when
9  he gave his 2007 statement.  Therefore, the officers were required to give him the *Miranda*
10 warnings.

11 First, the manner in which Jones was summoned to the interview was not coercive.  The
12 police came to his front door and asked him to come into the police station, at his convenience,
13 to talk about the investigation they did on his computers.  Jones agreed to come the next day after
14 work, and even arrived early.  He was not physically or psychologically threatened to come to the
15 interview and could have chosen not to show up the next day.  Instead, he came to the police
16 station, knowing that he would be questioned.  *See United States v. Kim*, 292 F.3d 969, 974-75
17 (9th Cir. 2002) (holding that "[i]f the police ask-not order-someone to speak to them and that
18 person comes to the police station, voluntarily, precisely to do so, the individual is likely to
19 expect that he can end the encounter").

20 Second, the way in which Jones was directly, and continually confronted with the
21 evidence of his guilt, despite his protestations, supports his assertion that the interview was
22 custodial.  At one point in the interview, the detective explains that he will demonstrate his
23 capabilities and show Jones what he has learned during the forensic search of his computers,
24 despite the fact that they had never met.  The detective called it a "little mind reading session."
25 Jones 2007 Statement at 21, Exhibit 4 to Hearing.  The detective then tells Jones what kind of
26 music he likes, his religious affiliation, and that he enjoys martial arts.  Jones confirms these
27 findings, but denies ever looking at adult or child pornography.  He continues denying ever
28 possessing or downloading child pornography for around 74 pages of transcript.

1    The detectives continually and relentlessly demanded that he tell the truth and confront
2 the evidence before him. For example:

3    A.  I don't ... view, view pornography.
     Q.  Well you've got a lot of it on your computer mister. A lot of it. And a lot of
4        it's child pornography. Want me to show it to you? _____ show it to you.
     A.  No. I –
5    Q.  No, no. You need to see it because this is on your computer. You need to see
         it. Sure you do. You need to see it. Sure you do. (Whispering) You need
6        to see it Scott.

7 Jones 2007 Statement at 49, Exhibit 4 to Hearing.

8    Q.  Take a look! No, you need to look. You need to look at what's on your
         computer. Would you like to look at about four or five thousand more?
9    A.  No.
     Q.  Well you need to. Here, here's another one.
10   A.  _____
     Q.  Here. Take a look at this one. How about this one? Or maybe this one.
11       Here, how about this one Scott? Here, take a good look at this, this is a good
         one. Here you go. Take a look at this and tell me what you think. Take a
12       look at this. Tell me what you think. Tell me what you think somebody
         would think of a person you are?
13
Jones 2007 Statement at 58-59, Exhibit 4 to Hearing. In addition they told him that "people
14
these days got a hot iron poker for people that are trying to do stuff to kids." Jones 2007
15
Statement at 44, Exhibit 4 to Hearing. The interview has a constant theme of asking Jones
16
whether he just made a mistake or whether he is the type of person "out trying to do something to
17
a kid somewhere." *Id.*
18
      These statements, and others like it, rise to a level of confrontation that would tend to
19
make a reasonable person believe that they were not free to leave at any time. *See Bassignani*,
20
575 F.3d at 884 (holding that a defendant is in custody when an interrogator "adopts an
21
aggressive, coercive, and deceptive tone"). The second factor weighs in favor of finding that
22
Jones was in custody.
23
      Third, the physical surroundings of Jones' interview are not indicative of a custodial
24
interrogation. Though the interview was conducted at the police station, it was held in a standard
25
sized, unlocked interview room that is used for both victims and witnesses. There were only two
26
detectives in the room with Jones, and neither one blocked his way to the exit or kept him from
27
leaving. Just because an interview takes place in a police station, does not mean that it is a
28

1   custodial interview. *California v. Beheler*, 463 U.S. 1121, 1125 (1983).

2   Fourth, the duration of the detention supports Jones' assertion that he was in custody. He
3   was interviewed for nearly two and a half hours, the bulk of which was spent attempting to get
4   him to admit to downloading child pornography. *See Bassignani*, 575 F.3d at 886 (holding that
5   an interview lasting two and a half hours leaned in favor of finding that the defendant, accused of
6   possessing child pornography, was in custody.) Less weight may be given to this factor if the
7   court finds that the interview was not a marathon session designed to force a confession. *Id*.

8   The length of time that Jones was confronted with evidence of his crime would lead a
9   reasonable person to believe that there would be no release until after admitting to wrongdoing.
10  For example, Jones was told,

> We don't need you to tell us anything for our benefit. We got everything we need.
> And we gave you the benefit of the doubt and showed you that we're not even
> bluffing. And you say I would never do anything to hurt a child and you close your
> eyes, 'cause you couldn't help it 'cause your body _____ look at that lie comin' out
> of your mouth. So stop lyin' and tell the truth, or let's get on with this. 'Cause I'm
> not gonna sit here and be sprinkled on by you for however long you feel like draggin'
> this out.[2]

15  Jones 2007 Statement at 92-93, Exhibit 4 to Hearing. Such comments, combined with the level
16  of confrontation with evidence of guilt, would lead a reasonable person to believe that the
17  interview would continue until an admission was made. In fact, Jones' interview ended shortly
18  after he admitted to wrongdoing. This factor supports Jones' argument that he was in custody.

19  Fifth, the degree of pressure applied to detain Jones was very low. Jones came to the
20  interview unaccompanied by police after he had finished work. At the very beginning of the
21  interview the detectives told him, "We're not making you, um, sit here and talk with us or
22  anything like that." Jones 2007 Statement at 3, Exhibit 4 to Hearing. Jones was specifically told
23  that he was not under arrest and that the police did not intend for him to feel like he was under
24  arrest. *Id*. At the end of the interview, he was not arrested and was allowed to go home. A

---

[2] This last statement could be interpreted as an attempt to detain Jones in the room, but in context it seems more like an attempt to get Jones to confess rather than an attempt to detain Jones. *See Bassignani*, 575 F.3d at 886 n.8 (holding that the statement "You'll walk out of here when we're done," was not an implied statement that defendant was not free to leave).

1  defendant is generally not in custody where he is allowed to leave after an interview. *United*
2  *States v. Norris*, 428 F.3d 907, 912 (9th Cir. 2005).
3     Here, the first, third, and fifth factors support a finding that Jones was not in custody
4  while the second and fourth facts support a finding that Jones was in custody. This is a close
5  case, but based on the totality of the circumstances, Jones was in custody. The interview was
6  long and Jones was directly and aggressively confronted with evidence of his guilt for nearly the
7  entire time. Because of the second and fourth factors, a reasonable innocent person would
8  conclude that he or she would not be free to leave. *Bassignani*, 575 F.3d at 883.
9     The situation surrounding the confrontation is similar to that of other cases where a
10 defendant was found to be in custody. *See e.g. United States v. Beraun-Panez*, 812 F.2d 578,
11 581 (9th Cir. 1987) (holding that defendant was in custody where he was questioned in a deserted
12 rural area, and officers told defendant that, based on the evidence they had, he would likely be
13 deported if he did not cooperate); *United States v. Wauneka*, 770 F.2d 1434, 1438-39 (9th Cir.
14 1985) (holding that defendant was in custody where he was told he'd given information that only
15 a perpetrator would know, he was visibly shaken by the ordeal, and other factors); *United States*
16 *v. Lee*, 699 F.2d 466, 468 (9th Cir. 1982) (holding that defendant was in custody where he was
17 confronted with evidence of guilt while being questioned in the back of an FBI sedan while
18 officers searched his home). Because Jones was in custody, he should have been given the
19 Miranda warnings.
20    B.  Whether Jones' Statement was Voluntary
21    To determine whether a statement was voluntarily, the court considers whether the
22 totality of the circumstances surrounding the interrogation were such that the defendant's will
23 was overborne. *United States v. Wright*, 625 F.3d 583, 603 (9th Cir. 2010). Circumstances to
24 evaluate include the length of the interrogation, the location, its continuity, and whether any
25 techniques or methods offensive to due process were used. *Clark v. Murphy*, 331 F.3d 1062,
26 1072 (9th Cir. 2003).
27    Length in the context of custody is not the same as length in the context of whether a
28 statement was voluntarily given. Coercion involves more outrageous conduct then even an

1  interrogation lasting all day.  *United States v. Haswood*, 350 F.3d 1024, 1028 (9th Cir. 2003).
2  Two and a half hours is not long enough for Jones' will to be overborne.
3        The location of the interview was not in a coercive environment.  He was questioned in a
4  standard eight by ten or twelve foot room used to question both witnesses and victims.  *See*
5  *Clark*, 331 F.3d at 1064-65, 1073 (holding that a room that was either six by eight feet or eight
6  by ten feet was unremarkable).
7        Continuing to question a defendant after he claims he is innocent or continually telling a
8  defendant to tell the truth does not constitute coercion.  *Cunningham v. City of Wenatchee*, 345
9  F.3d 802, 810 (9th Cir. 2003); *Amaya-Ruiz v. Stewart*, 121 F.3d 486, 494 (9th Cir. 1997).
10       Reviewing the totality of the circumstances, there is nothing to indicate that Jones' will
11 was overborne.
12 ///
14 ///
16 ///
18 ///
20 ///
22 ///
24 ///
26 ///
28 ///

## RECOMMENDATION

Based on the foregoing and good cause appearing therefore,

IT IS THE RECOMMENDATION of the undersigned Magistrate Judge that the Defendant's Motion to Suppress (#24) be **DENIED** in part and **GRANTED** in part.

IT IS FURTHER RECOMMENDED that Defendants' Motion to Suppress (#24) be **DENIED as to his 2005 statement**.

IT IS FURTHER RECOMMENDED that Defendant's Motion to Suppress (#24) be **DENIED as to the 2005 search pursuant to the search warrant**.

IT IS FURTHER RECOMMENDED that Defendants' Motion to Suppress (#24) be **GRANTED as to his 2007 statement**.

## NOTICE

Pursuant to Local Rule IB 3-2 **any objection to this Report and Recommendation must be in writing and filed with the Clerk of the Court on or before April 27, 2011.** The Supreme Court has held that the courts of appeal may determine that an appeal has been waived due to the failure to file objections within the specified time. *Thomas v. Arn*, 474 U.S. 140, 142 (1985). This circuit has also held that (1) failure to file objections within the specified time and (2) failure to properly address and brief the objectionable issues waives the right to appeal the District Court's order and/or appeal factual issues from the order of the District Court. *Martinez v. Ylst*, 951 F.2d 1153, 1157 (9th Cir. 1991); *Britt v. Simi Valley United Sch. Dist.*, 708 F.2d 452, 454 (9th Cir. 1983).

DATED this   13th   day of April, 2011.

ROBERT J. JOHNSTON
United States Magistrate Judge